**Dianne M. MANN, trustee of the bankruptcy estate of Courtney Ann Wiggs, Plaintiff,**

v.

**NEW YORK LIFE INSURANCE AND ANNUITY CORP., a Delaware Corp., Defendant.**

**No. CIV.00–1570 PHX–MHM.**

United States District Court, D. Arizona.

Sept. 18, 2002.

WL 1640069 *14 (D.Minn. June 22, 2001). The Court is, however, persuaded by the well-reasoned opinion in *Nextel*, supra, and declines to follow those decisions.

Nicholas C Guttilla, Alisan MB Patten, Patrick M Murphy, Guttilla & Murphy, PC, Phoenix, AZ, for Courtney Wiggs, a widow, plaintiff.

Robert Clifford Hackett, Daniel Paul Beeks, Mohr Hackett Pederson Blakley & Randolph, PC, Phoenix, AZ, for New York Life Insurance Company and Annuity Corp, a Delaware corporation, defendant.

Dianne M Mann, Trustee of the Chapter VII Bankruptcy Estate of Courtney Anne Wiggs, trustee.

## ORDER

MURGUIA, District Judge.

Pending before the Court are the parties' cross-motions for summary judgment. [Docs # 33 and 34].

### I. Background

This matter arises out of a conditional temporary coverage agreement (the "agreement") entered into by the parties.[1]

On or about August 28, 1998, Lucas Wiggs ("Lucas") submitted an application for a $2 million variable life insurance policy with Defendant to Bruce Usher ("Usher"), an agent for the Defendant. At the same time Lucas submitted a check for $600 to purchase a $1 million temporary benefit for 90 days while his regular policy was being underwritten. After receiving Lucas' check, Usher provided him with the agreement, which set forth the terms of the temporary coverage. The agreement contained a paragraph entitled "Conditions to Coverage", which stated:

The Conditions to Coverage are as follows:

(a) Any required application Part II and any medical or paramedical examination, which is part of the initial requirements for this application, must have been completed;

(b) All statements which are in the application for the policy, including both Part I and any required Part II, must be complete and true, to the best of the knowledge and belief of those persons who made them ...

Part I and Part II referred to the separate parts of the regular policy application. Part I was filled out and signed at that time by Lucas. On September 9, 1998, Lucas met with a paramedical examiner retained by Defendant to complete Part II of the application. Question six of Part II asked:

In the last 10 years has such person:

(a) been counseled, treated or hospitalized for any psychiatric, emotional or mental health condition?

(b) used cocaine or other controlled substance or been counseled, treated or hospitalized for drug use?

Lucas answered no to question 6(a), but yes to 6(b). After answering yes, Lucas explained that he had tried marijuana in January 1991, through March, 1991. Lucas failed to disclose, however, that, on April 21, 1998, he had been treated in a hospital emergency room for complications resulting from the intravenous injection of cocaine. Lucas also failed to disclosed that, from April 22, 1998 through June 16, 1998, he had been treated on an outpatient basis for cocaine dependency.

On or about September 24, 1998, Usher contacted Lucas and asked him to clarify his statements regarding prior drug use. At that time, Lucas indicated only that he

---

1. Plaintiff Courtney A. Wiggs is the spouse of decedent Lucas A. Wiggs. The Wiggs participated in the factual transactions in this matter. Courtney Wiggs subsequently filed for Chapter 7 bankruptcy. Subsequently, the Trustee ratified this matter and agreed to be bound by the outcome. Consequently, the Trustee is now the real party in interest and Courtney Wiggs is included only as a nominal Plaintiff.

had smoked marijuana once and never received drug counseling.

Prior to the completion of the underwriting process, on November 11, 1998, Lucas died in a car accident. Thereafter, on November 30, 1998, Courtney Wiggs ("Courtney"), the beneficiary of Lucas' life insurance coverage, submitted a claim to Defendant. After an investigation, on July 7, 1999, Defendant denied Courtney's claim and returned the $600, plus interest, Lucas had tendered to purchase the temporary coverage, because of Lucas' misrepresentations about his prior drug use and treatment.[2]

On February 29, 2000 Courtney commenced this action seeking to have Defendant pay out her claim under the agreement. On December 3, 2001, the parties filed cross motions for summary judgment. In their motion, Plaintiffs allege that the agreement was in full effect at the time of Lucas' death, because, at the time Lucas tendered payment to Usher, he had a reasonable expectation of coverage. Defendant argues that, pursuant to Arizona statute, Plaintiff's misrepresentations justifies its refusal to pay coverage under the agreement.

## II. Legal Standard

A court must grant summary judgment if the pleadings and supporting documents, viewed in the light most favorable to the nonmoving party, "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c) (1995); see *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Jesinger v. Nevada Fed. Credit Union,* 24 F.3d 1127, 1130 (9th Cir.1994). Substantive law determines which facts are material. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see Jesinger,*

24 F.3d at 1130. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. The dispute must also be genuine, that is, "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.; see Jesinger,* 24 F.3d at 1130.

A principal purpose of summary judgment is "to isolate and dispose of factually unsupported claims." *Celotex,* 477 U.S. at 323–24, 106 S.Ct. 2548. Summary judgment is appropriate against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322, 106 S.Ct. 2548; *see Citadel Holding Corp. v. Roven,* 26 F.3d 960, 964 (9th Cir.1994). The moving party need not disprove matters on which the opponent has the burden of proof at trial. *Celotex,* 477 U.S. at 317, 106 S.Ct. 2548. However, the party opposing summary judgment "may not rest upon the mere allegations or denials of [the party's] pleadings, but ... must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Brinson v. Linda Rose Joint Venture,* 53 F.3d 1044, 1049 (9th Cir.1995).

## III. Discussion

In the life insurance industry, an agreement for preliminary coverage, such as the agreement at issue in this case, is typically called a "binder." However, "[b]y whatever name it may be known, a 'binder' for temporary insurance is a contract. Assuredly it is a contract in contemplation of

---

**2.** No premiums had been paid on the full      policy prior to Lucas' death.

a subsequent and more formal agreement, but by its nature it incorporates the terms of the prospective insurance contract, whether those terms are prescribed by law or are part of the customary policy issued by the insurer." *Turner v. Worth Ins. Co.,* 106 Ariz. 132, 472 P.2d 1, 2 (1970).

In the current matter, Defendant asserts that Lucas violated the terms of the parties' contract by answering questions about his prior drug use and treatment falsely. Relying on A.R.S. § 20–1109, Defendant argues that these misstatements were of such a nature as to permit Defendant to reject coverage under the terms of the agreement.

§ 20–1109 states that:

All statements and descriptions in any application for an insurance policy or in negotiations therefor, by or in behalf of the insured, shall be deemed to be representations and not warranties. Misrepresentations, omissions, concealment of facts and incorrect statements shall not prevent a recovery under the policy *unless:*

1. Fraudulent.
2. Material either to the acceptance of the risk, or to the hazard assumed by the insurer.
3. The insurer in good faith would either not have issued the policy, or would not have issued a policy. in as large an amount, or would not have provided coverage with respect to the hazard resulting in the loss, if the true facts had been made known to the insurer as required either by the application for the policy or otherwise.

(emphasis added)

§ 20–1109 applies to binders as well as to other types of insurance contracts. *Prudential v. Estate of Rojo–Pacheco,* 192 Ariz. 139, 962 P.2d 213, 220 (App.1997). Under the statute, "[r]escission of an insurance policy is permitted only if all three subparagraphs are satisfied." *Greves v.*

*Ohio State Life Ins. Co.,* 170 Ariz. 66, 821 P.2d 757, 762 (App.1991). Further, the "burden is on the insurance company to prove each element before rescission is allowed." *Id.* Accordingly, if Defendant is able to demonstrate that, viewing the evidence in the light most favorable to the Plaintiff, an issue of material fact does not exist as to whether Lucas' misstatements were fraudulent, material, and, if the truth had been known by Defendant, would have caused it to reject coverage, then Defendant is entitled to summary judgment on Plaintiff's' claims.

*Were the misstatements fraudulent?*

"If a question on an insurance application seeks facts which are presumably within the personal knowledge of the insured and are such that the insurer would naturally have contemplated that the answer represented the actual facts and the answer is false, the insured has committed legal fraud and rescission is allowed." *Stewart v. Mutual of Omaha Ins. Co.,* 169 Ariz. 99, 817 P.2d 44, 47–48 (App.1991). Consequently, where questions seeking facts only are asked " . . . it is not necessary that actual fraud, or intent to deceive, be shown in order to make such an insurance policy voidable." *Mutual Life Ins. Co. of N.Y. v. Morairty,* 178 F.2d 470, 473–474 (9th Cir.1949) Conversely, "[w]here the response is merely an expression of opinion, the insurer must prove actual fraud to rescind a policy under the statute" Stewart, 817 P.2d at 47–48.

In the current matter, Lucas was asked questions regarding his knowledge of his own past drug use and treatment. Questions regarding incidents of drug use are fact based and do not call for opinions. *Equitable Life Assur. Soc. of the U.S. v. Anderson,* 151 Ariz. 355, 727 P.2d 1066, 1069 (App.1986). Accordingly, Defendant need only show that Lucas' answers were false in order to meet the first element of

the statute. Of this there can be no dispute.

■ Lucas told Defendant's paramedical examiner and Usher that he had used marijuana only once and had never been treated for drug addiction. Both of these statements were patently false, as Lucas had been hospitalized and treated for addiction to cocaine mere months before his meetings with Defendant's representatives. Consequently, Lucas committed fraud, within the meaning of § 20–1109, when he failed to inform Defendant of his past drug use and treatment.

*Were the misstatements material?*

"The test of materiality is whether the facts, if truly stated, might have influenced a reasonable insurer in deciding whether to accept or reject the risk; the insurer need not show that it would have rejected the applicant had it known of the falsity of the claim." *Mutual Life, 178 F.2d at 473–74; see also, Central Natl. Ins. Co. v. Peterson,* 23 Ariz.App. 4, 529 P.2d 1213, 1216 (App.1975). Accordingly, Defendant need show only that the truth of Lucas prior drug use would have influenced its decision whether or not to underwrite his policy. Again, of this there can be no dispute.

Defendant's underwriting guidelines specifically preclude the issuing of a life insurance policy to anyone who has engaged in either occasional or regular use of cocaine or other narcotics in the two years prior to his application. Based on this explicit policy, there can be no reasonable dispute that the truth of Lucas' prior drug use would have at least influenced Defendant's underwriting decision. *Equitable Life,* 727 P.2d, at 1069–1070 (evidence of defendant's underwriting policy which precluded issuing policies to persons who used narcotics was sufficient to demonstrate that answers to questions about prior drug use were material under A.R.S. § 20–

1109). As such, Lucas'. misstatements were material.

*Would the policy of been issued if Lucas had truthfully revealed his prior drug use and treatment?*

In order to meet the third and final prong of § 20–1109, Defendant must demonstrate that, had it known the truth, it would not have issued a policy to Lucas under any circumstances. Merely demonstrating that Lucas would have received a high risk, rated, or other increased premium policy is insufficient. *Greves,* 821 P.2d, at 765.

To meet its final burden, Defendant relies on its underwriting guidelines which state that:

**RATINGS FOR DRUG HABITS**

\*\*\*\*

| I. Marijuana only | | | |
|---|---|---|---|
| \*\*\* | | | |
| II. Other Drugs | Within 2 Yrs. | 3–5 Yrs. | 6–10 Yrs. |
| \*\*\* | | | |
| B. Depressants (e.g., barbiturates), # Narcotics (e.g., heroin, morphine), and Psychedelics (e.g., LSD, cocaine) See opp. Page for Urine Test Positive for Cocaine | | | |
| 1. Occasional use . . . . | RNA | 100 | 0 |
| 2. Regular use . . . . . . | RNA | RNA | 100 |

(PSOF Exhibit D–84 at 3.)

"RNA" means "risk not acceptable." Based on these guidelines, Defendant argues that it is apparent and indisputable that, had Lucas answered questions about his prior drug use and treatment truthfully (ie., the fact that he had used cocaine within the prior two years), Defendant would not have issued him a life insurance policy of any sort, because as the Guidelines indicate he would have been "RNA", "risk not acceptable." Arguing that such evidence sufficiently meets its burden of

proof, Defendant cites to *Equitable Life Assur. Soc. of the U.S. v. Anderson, supra,* where the Court determined that a corporate policy precluding the issuance of life insurance policies to individuals who used narcotics was conclusive proof, under § 20–1109, that a policy would not have been issued to an individual who used narcotics had he told the truth about his drug use. *Equitable Life,* 727 P.2d at 1069–70. In response, Plaintiff fails to offer any evidence to the contrary. Based on the evidence presented, it is clear that had Lucas been truthful Defendant would not have issued him a policy. No reasonable finder of fact could conclude otherwise. Accordingly, Defendant has met its burden of proof as to the third and final prong of A.R.S. § 20–1109, and was entitled to rescind the policy on July 7, 1999.

In its motion papers Plaintiff does not affirmatively dispute this conclusion. Plaintiff does dispute, however, that this conclusion entitles Defendant to summary judgment. Instead, Plaintiff argues that, based on the doctrine of reasonable expectation, A.R.S. § 20–1109 and the explicit terms of the agreement are inapplicable, and, regardless of what Defendant demonstrates, Plaintiff is entitled to summary judgment on her claims.

"Provisions of insurance contracts must be construed in a manner according to their plain and ordinary meaning." *Sparks v. Republic Nat'l Life Ins. Co.,* 132 Ariz. 529, 534, 647 P.2d 1127, 1132, *cert. denied,* 459 U.S. 1070, 103 S.Ct. 490, 74 L.Ed.2d 632 (1982). Arizona courts, in interpreting insurance contracts however, employ the reasonable expectations doctrine originally set forth in *Darner Motor Sales, Inc. v. Universal Underwriters Insurance Co.,* 140 Ariz. 383, 682 P.2d 388 (1984) and will refuse to apply even unambiguous insurance contract provisions in certain limited circumstances. *Gordinier v. Aetna Casualty and Surety Co.,* 154 Ariz. 266, 742 P.2d 277 (1987). As noted, this doctrine is applied only in limited situations, such as where "the insured did not receive full and adequate notice of [a] term in question" or "[w]here some activity which can be reasonably attributed to the insurer would create an objective impression of coverage in the mind of the reasonable insured" and the provision the insurer is seeking to enforce "emasculates apparent coverage." *Id.* at 283–4.

■ Plaintiff argues that at the time Lucas paid the $600 premium for temporary coverage he reasonably believed he had coverage, because the payment was a sign of commitment and Lucas was never specifically informed that he had to truthfully complete part II of the insurance application. Plaintiff's argument is not well taken, however, because the reasonable expectations doctrine is inapplicable in the current matter.

■ It is it the general rule that coverage is not afforded until an insurance applicant "complies with the conditions precedent to coverage under the plain and unambiguous terms of the conditional receipt." *Corral v. Fidelity Bankers Ins. Co.,* 129 Ariz. 323, 630 P.2d 1055, 1059 (App.1981). To that end, it cannot be disputed that the agreement explicitly required an applicant to complete part II of the insurance application before coverage would be effective. The reasonable expectations doctrine was not created to apply to every single term of an insurance contract. Rather it is applied in limited circumstances towards contract terms that are "essentially invisible boilerplate terms" which are difficult to understand and "are neither read nor expected to be read by either the person who sells the policy or the person or buys it." *Gordinier* 742 P.2d, at 282. These terms are typically of such a self-protective nature as to create a contract of adhesion. *Id.* For example, in

*Gordinier* and *State Farm Mut. Auto. Ins. Co. v. Dimmer,* 160 Ariz. 453, 773 P.2d 1012 (App.1988), the courts used the doctrine to invalidate clauses that defined who was covered under a policy in a deceptive and highly technical manner that clearly went against the intent of the insured. Conversely in, *Krizanich v. Liberty Mut. Fire Ins. Co.,* 181 Ariz. 108, 887 P.2d 989 (App.1994), the court refused to invalidate a clause where it was "neither remote nor submerged in boilerplate nor textually obscure." *Krizanich,* 887 P.2d, at 992.

In the current matter, the requirement to complete a paramedical exam and answer all questions in Part II of the application in a truthful manner prior to temporary coverage being effective was clearly and plainly stated. Plaintiff argues that there is no evidence that Defendant ever informed him that Part II was a requirement to temporary coverage, only to permanent coverage. Plaintiff's argument is flawed as demonstrated by the CTCA itself. Page 3 of the CTCA tells the applicant that he need not complete questions 14–17 if a Part II is required. (PSOF Exhibit A–1 at 3.) Lucas did not complete questions 14–17 clearly indicating his knowledge that Part II was required. In addition, Usher testified that he always reviews the requirement of completing Part II before coverage is in effect. No reasonable fact finder could conclude otherwise. *Id.* As such, the reasonable expectations doctrine is inapplicable to the current matter. Despite the prerequisites to coverage, Lucas chose to boldly lie and conceal material information from Defendant that would have invalidated coverage on more than one occasion. Consequently, A.R.S. § 20–1109 is applicable, and Defendant was correct in rescinding its coverage. Summary judgment must therefore be entered for the Defendant.

Accordingly,

**IT IS ORDERED** that Defendant's motion for summary judgment is **GRANTED;**

**IT IS FURTHER ORDERED** that Plaintiff's motion for summary judgment is **DENIED;**

**IT IS FURTHER ORDERED** that the Clerk of the Court shall enter judgment accordingly.